FILED

04/11/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0229

DA 15-0229

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 79

STATE OF MONTANA,

Plaintiff and Appellee,

v.

RYLAN TALKSABOUT,

Defendant and Appellant.

APPEAL FROM:     District Court of the Eighth Judicial District,
                 In and For the County of Cascade, Cause No. ADC 13-374
                 Honorable Gregory G. Pinski, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Chad Wright, Chief Appellate Defender, Kristen L. Peterson, Assistant
                Appellate Defender, Helena, Montana

        For Appellee:

                Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
                Attorney General, Helena, Montana

                Daniel Guzynski, Mary Cochenour, Special Deputy Cascade County
                Attorneys, Helena, Montana

                                        Submitted on Briefs:  February 8, 2017

                                                Decided:  April 11, 2017

Filed:

                                    _____
                                                Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1　The State charged seventeen-year-old Rylan Talksabout with two counts of sexual intercourse without consent. Talksabout sought to have each charge transferred to Youth Court. After analyzing the relevant statutory factors, the District Court denied both transfer motions. Talksabout eventually pleaded guilty to one count, and the court sentenced him to fifty years in prison, with ten years suspended. We address the following issues on appeal:

> 1.　*Whether the District Court abused its discretion by denying Talksabout's requests to transfer the charges to Youth Court;*
>
> 2.　*Whether the District Court erred in sentencing Talksabout.*

¶2　Applying appropriate deference, we affirm the District Court's refusal to transfer the charges to Youth Court. We remand for entry of an amended judgment and review of the sentence as provided by law.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3　In August 2013, the State filed an information in the District Court charging Talksabout with one count of sexual intercourse without consent. The State filed the information directly in the District Court pursuant to § 41-5-206(2), MCA, because of the nature of the charge and because Talksabout was seventeen when the offense occurred. The charge arose out of Talksabout's non-consensual sexual contact with fourteen-year-old A.C. during an underage drinking party. An intoxicated A.C. told Talksabout that she did not want to have sex, but Talksabout undressed her and digitally penetrated her after trying to have sex with her.

2

¶4    The District Court held a hearing in January 2014 pursuant to § 41-5-206(3), MCA, to determine whether the case should be transferred to Youth Court. Juvenile Probation Officer Tim Callahan and Great Falls Police Detective Mike Stimac testified for the State. Licensed psychologist Dr. Bowman Smelko and Talksabout's grandmother Betty Trombley—with whom Talksabout lived—testified on Talksabout's behalf. Dr. Smelko had evaluated Talksabout and opined that Talksabout's interests and the interests of the community would best be served by handling the case in Youth Court. The District Court agreed that transferring the case to Youth Court would be in Talksabout's best interests. It concluded, however, that the nature of the offense and the interests of community protection weighed against transferring the case to Youth Court. The District Court therefore denied the transfer motion. The court noted further that Talksabout was under investigation for an unrelated sex offense involving a minor.

¶5    In January 2014, the State filed another information in the District Court charging Talksabout with a separate count of sexual intercourse without consent. Even though Talksabout was only sixteen at the time of that offense, the State again filed the information directly in the District Court because sexual intercourse without consent is an enumerated offense under § 41-5-206(1), MCA. The incident involved D.P., who was twelve at the time. The second incident was similar to the first—D.P. and Talksabout were at an underage drinking party and Talksabout got D.P. alone in a room, undressed her, and had sex with her after being told no.

¶6    The two cases were consolidated on the State's motion. In July 2014, the District Court held another hearing pursuant to § 41-5-206(3), MCA, to determine whether to

3

transfer the second incident to Youth Court. Adult Probation Officer Susan Carroll and Detective Stimac testified on behalf of the State, and Dr. Smelko again testified on behalf of Talksabout. The court once more found the statutory criteria for transfer to Youth Court were not met and denied Talksabout's motion.

¶7 Ultimately, Talksabout agreed to a non-binding plea agreement under which he pleaded guilty to one count of sexual intercourse without consent. The agreement required that Talksabout admit to the facts of both incidents involving A.C. and D.P. The District Court sentenced Talksabout to Montana State Prison for fifty years, with ten years suspended. The court's sentence did not reflect that Talksabout was a criminally convicted youth. Talksabout appeals.

## STANDARDS OF REVIEW

¶8 We review for abuse of discretion a district court's decision whether to transfer to youth court a juvenile case charged in district court. *State v. Dietsch*, 2013 MT 245, ¶ 10, 371 Mont. 460, 308 P.3d 111. A court abuses its discretion if it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. We review for clear error the specific findings of fact on which the district court relied in making its transfer decision. *State v. Whiteman*, 2005 MT 15, ¶ 10, 325 Mont. 358, 106 P.3d 543. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Whiteman*, ¶ 10. We view the evidence in the light most favorable to the prevailing party when determining whether a district

4

court's findings are supported by substantial credible evidence. *Welu v. Twin Hearts Smiling Horses, Inc.*, 2016 MT 347, ¶ 12, 386 Mont. 98, 386 P.3d 937. We review criminal sentences for legality, to determine whether they are within the parameters set by statute as a matter of law. *Dietsch*, ¶ 10.

## DISCUSSION

¶9     *1.   Whether the District Court abused its discretion by denying Talksabout's requests to transfer the charges to Youth Court.*

¶10     Section 41-5-206, MCA, authorizes the State to charge a youth directly in district court under certain circumstances. A county attorney may seek leave to file an information in district court if the youth was twelve years old or older at the time of the conduct and is alleged to have committed one of several enumerated offenses. Section 41-5-206(1), MCA. If, however, the youth was seventeen years old at the time of the alleged enumerated offense, the county attorney must petition for leave to file the information in district court. Section 41-5-206(2), MCA.

¶11     In either instance, once leave to file the information is granted, "the district court shall conduct a hearing to determine whether the matter must be transferred back to the youth court," unless the youth or the youth's counsel waives the hearing. Section 41-5-206(3), MCA. The district court may transfer the case to youth court only if it finds, by a preponderance of the evidence, that:

> (a) a youth court proceeding and disposition will serve the interests of community protection;
>
> (b) the nature of the offense does not warrant prosecution in district court; and

5

(c) it would be in the best interests of the youth if the matter was prosecuted in youth court.

Section 41-5-206(3), MCA. Each of these factors must be met in order to transfer the case to youth court. Section 41-5-206(3), MCA. In analyzing these factors, a district court, "as factfinder[,] sits in the best position to weigh all of [the] evidence" and "resolve[] conflicting evidence before it." *Dietsch*, ¶¶ 15, 16. Generally, we will not overturn a district court's determinations regarding conflicting evidence. *Dietsch*, ¶ 16; *accord Whiteman*, ¶ 15 ("[I]t is within the domain of the trial court to resolve conflicts in the evidence based on its assessment of the demeanor and credibility of the witnesses before it, and this Court will not resolve conflicts on appeal.") (citation and internal quotes omitted).

### I. Talksabout's first transfer request.

¶12 In considering Talksabout's motion on the first charge, the District Court reviewed the evidence in light of each factor prescribed by § 41-5-206(3), MCA. First, as to whether transferring the charge to Youth Court would serve the interests of community protection, the District Court noted that Probation Officer Callahan "explained that protecting the community is more challenging with older youths, and given his age, Talksabout cannot complete sex offender treatment before he turns 18 years-old." The court emphasized Probation Officer Callahan's testimony that unlike in district court, sex offender registration is not required in a Youth Court disposition. The court noted its concern that prior to the transfer hearing, "Talksabout absconded while released on his own recognizance, failed to appear for Court, and committed a new offense by shoplifting from

6

a local department store." The court expressed further concern that Talksabout was under investigation for a separate sex offense involving a minor.

¶13 The court acknowledged that Talksabout's grandmother cared for and was committed to her grandson. But it opined that "Talksabout is not provided with much structure or discipline [at his grandmother's home], as evidenced by dropping out of school and allegedly committing the present offense while out of the house in the middle of the night without his grandmother's knowledge." Finally, the court noted its concern over Talksabout's "victim impact statements" from Dr. Smelko's report. The statements conveyed that Talksabout believed that he was the real victim in the situation, exhibiting a lack of empathy and accountability. After considering all of the evidence, the District Court concluded that transferring the case to Youth Court was not in the interests of community protection given "Talksabout's age, home environment, conduct while on release, minimization of his alleged conduct, and need for more structured supervision if convicted."

¶14 The District Court next considered whether the nature of the offense warranted prosecution in district court. The court noted that in analyzing this factor, it was required to examine the nature of the allegations and not just the offense itself. (Citing *Whiteman*, ¶ 13.) The court declared that "there are few offenses more serious than sexual intercourse without consent[,] and using intoxicants to perpetrate such an offense is inexcusable." The court then summarized Detective Stimac's testimony, stating that "Talksabout knew the victim's age and that she was menstruating, yet proceeded to undress her, digitally penetrate her, remove her clothes, and vaginally penetrate her on multiple occasions." The

7

court noted that during the transfer hearing, "Talksabout's counsel faulted the victim for becoming intoxicated, flirting with multiple boys at the party, and grabbing Talksabout's genitals." The court stated not only that it was unpersuaded by Talksabout's "implicit assertion" that "'date rape' is a crime of lesser gravity," but that such a belief "is as repugnant as it is unsupported." The District Court concluded that the nature of the allegations warranted prosecution in District Court.

¶15　Addressing whether transferring the case to Youth Court would be in Talksabout's best interest, the court recognized Dr. Smelko's testimony that "prosecution in District Court will harm Talksabout's cognitive and behavioral development, increase his risk to reoffend, and he matches the profile of an offender that can be treated in Youth Court." The court noted that the State presented very little evidence to contradict Talksabout's position. The court therefore determined that Talksabout's best interests weighed in favor of transferring the case to Youth Court. Because Talksabout failed to establish two out of the three elements for transfer under § 41-5-206(3), MCA, the court denied the transfer to Youth Court and retained jurisdiction.

¶16　On appeal, Talksabout contends that the District Court abused its discretion by finding that the interests of community protection and the nature of the offense warranted prosecution in district court. Talksabout argues that the court's findings on these two elements were not supported by substantial evidence.

¶17　Regarding the interests of the community, Talksabout contends that the evidence established that he had no prior violent criminal or drug history, that his grandmother could provide adequate supervision and make him comply with probation, and that Youth Court

8

could provide adequate supervision. Talksabout contends further that the District Court improperly disregarded Dr. Smelko's testimony.

¶18 Addressing the nature of the offense, Talksabout claims that the District Court was unwilling to consider any so-called "mitigating facts." These facts include: that Talksabout is "a developmentally immature 17-year-old"; that he "vaginally penetrated without consent a peer-age intoxicated 14-year-old"; that the other individuals at the party were teenagers and there was alcohol at the party; that the victim "kissed several boys at the party, and one youth stated A.C. actually put her hands down [Talksabout's] pants"; that another boy "first assaulted A.C. in a room alone"; that Talksabout "walked A.C. home and kissed her good night" after sexually assaulting her; and that Talksabout apparently thought A.C. was old enough to consent. Talksabout again asserts that the District Court failed to adequately consider Dr. Smelko's testimony in analyzing this factor. Talksabout relies heavily on the fact that the other boy charged in connection with the same incident had his transfer request approved.

¶19 Talksabout does not argue that the District Court committed any error of law. The Dissent contends, however, that the court erred in its interpretation of the transfer statute by failing to consider the "nature of the offense" in light of certain objectives of the Youth Court Act. In the absence of "specific criteria" by which to evaluate the nature of the offense, the Dissent proposes a new standard under which a district court must specifically consider certain legislative purposes articulated in § 41-5-102, MCA. Dissent, ¶ 66. But the legislative purpose governing transfer is that expressly articulated in § 41-5-206(3), MCA, and requires a preponderance of evidence on all three factors in order for the District

Court to transfer the matter to Youth Court for adjudication. The Youth Court Act's purposes are subsumed in § 41-5-206(3)(a) and (c), MCA, under which the District Court must analyze both the interests of community protection and the best interests of the youth. A youth's best interests include the remedial purposes the Dissent reiterates from the Youth Court Act's general purposes provision, § 41-5-102(2)-(3), MCA. Dissent, ¶ 68. And the District Court found that the preponderance of the evidence did support a finding that transfer to Youth Court was in Talksabout's best interests.

¶20 The Dissent cites no case applying § 41-5-206(3), MCA, since its 1997 amendment. Case law construing the current statute confirms that the District Court must look to the nature of the allegations—and not just the *seriousness* of the offense—in analyzing whether the nature of the offense warrants prosecution in district court. *Whiteman*, ¶¶ 13-15. The statute commits the question of transfer to Youth Court to the District Court's discretion. Section 41-5-206(3), MCA; *Dietsch*, ¶ 10; *Whiteman*, ¶ 19. We are not persuaded from our review of the record that the District Court's findings are clearly erroneous. The record substantiates the court's findings that Talksabout failed to show by a preponderance of the evidence that transferring the case to Youth Court would serve the interests of community protection and that the nature of the offense did not warrant prosecution in the District Court.

¶21 The record establishes that the District Court did not act arbitrarily or fail to employ conscientious judgment when it concluded that "Talksabout's age, home environment, conduct while on release, minimization of his alleged conduct, and need for more structured supervision if convicted, make[] the District Court a more appropriate forum to

10

supervise Talksabout." Nor did the court exceed the bounds of reason in concluding that the nature of the offense warranted prosecution in the District Court. Talksabout was accused of undressing and forcibly having sexual intercourse with an intoxicated fourteen-year-old after repeatedly being told no. Though both Dr. Smelko and Talksabout's grandmother provided testimony to support Talksabout's contentions, the District Court was in the best position to resolve the conflicting evidence before it. *Dietsch*, ¶¶ 15, 16. The District Court did not have to accept Talksabout's "mitigating facts," which it found to suggest the victim's responsibility for the incident. The evidence strongly indicated that, if convicted, Talksabout would need sex offender treatment. Talksabout expressed unwillingness to enter treatment, however, and denied that his conduct "sexually offended against" A.C. Even though he had not yet admitted to the offense, Talksabout put this evidence before the court through Dr. Smelko, and the District Court did not clearly err in considering it for the purpose of evaluating the nature of the offense and the interests of community protection.

¶22 It is not the appellate court's function to undertake, as the Dissent does, a *de novo* review of the record or to raise objections that might have been, but were not, made by the parties.[1] Instead, this Court reviews a district court's findings of fact for clear error. *Whiteman*, ¶ 10. It is the "trier of fact [that] resolves conflicts in the evidence before it,

___

[1] For example, no one objected at the first hearing to the District Court's consideration of Dr. Smelko's report, and the State moved for admission of Smelko's supplemental report at the second hearing—with no objection. And Talksabout did not raise, either in the District Court or on appeal, any issue concerning infringement of the presumption of innocence or his right to remain silent. Dissent, ¶¶ 53-60.

11

and this Court will not reevaluate this same evidence on appeal." *Whiteman*, ¶ 19; *accord Dietsch*, ¶ 15 ("The District Court as factfinder sits in the best position to weigh all of this evidence.").

¶23 The Dissent overlooks our decisions in *Whiteman* and *Dietsch* deferring to the district courts' refusal to transfer cases to Youth Court. In *Whiteman*, we found substantial credible evidence based on testimony from a corrections administrator and probation officer that the youth court had more limited resources for handling young violent offenders and that "youth court proceedings would limit the dispositional options to juvenile correctional or treatment facilities and only for the limited time frame of the youth court's jurisdiction." *Whiteman*, ¶¶ 17-18. In *Dietsch*, a case involving a sexual offense with circumstances nearly identical to those in the case at bar, we likewise emphasized the district court's reliance on the youth court's limited dispositional options, whereas district court prosecution "would allow dispositional options that would include supervision and rehabilitation 'for a period of up to Dietsch's remaining natural life.'" *Dietsch*, ¶ 14. We relied on evidence in the record concerning the facts of the alleged offense, Dietsch's "high lack of empathy," and his "highly significant familiarity about sex with underage girls in his community." *Dietsch*, ¶ 16. This evidence, we determined, was sufficient to support the district court's finding that the nature of the offense did not warrant youth court disposition. *Dietsch*, ¶ 16. It is difficult to reconcile *Whiteman* and *Dietsch* with the Dissent's analysis of how the District Court should have analyzed the statutory transfer factors in this case.

12

¶24    Like *Whiteman* and *Dietsch,* the evidence presented to the District Court regarding the § 41-5-206(3), MCA, factors conflicted.  As in those cases, however, the record contains substantial credible evidence to support the District Court's findings.  Bearing in mind that we view the evidence in a light most favorable to the prosecution, we conclude that the District Court did not abuse its discretion by denying Talksabout's motion to transfer to Youth Court the sexual intercourse without consent charge related to A.C.

**II. Talksabout's second transfer request.**

¶25    After hearing Talksabout's transfer request related to D.P., the District Court again analyzed the § 41-5-206(3), MCA, factors and likewise concluded that the factors necessitated retention in the District Court.  Similar to the first order, the District Court was concerned that Talksabout's age made treatment in Youth Court more difficult.  The court noted that Probation Officer Carroll "expressed concerns over the supervision of Talksabout in Youth Court because he has a negative attitude toward treatment, there are multiple alleged victims, and there is no accountability in Youth Court."  The court emphasized that Dr. Smelko had revised his evaluation to conclude that "Talksabout presents a moderate risk to reoffend."  And the District Court again highlighted Talksabout's "victim impact statements" from Dr. Smelko's report demonstrating that the youth did not take responsibility for his actions.  The District Court consequently concluded that the interests of community protection would best be served by continuing the case in district court.

¶26    The court's findings regarding the nature of the offense were nearly identical to its findings in the first transfer order.  The court summarized Detective Stimac's testimony

regarding the allegations as follows: "Talksabout knew the victim's age, removed her clothes, the victim protested, Talksabout persisted, and forcibly had sexual intercourse with the 12-year-old victim." The court also noted that the incident was alleged to have occurred a month before Talksabout's assault of A.C. The court thus concluded that the nature of the offense warranted prosecution in the District Court.

¶27 Finally, the District Court analyzed whether transfer to Youth Court would be in Talksabout's best interests. The court again highlighted Dr. Smelko's testimony. This time, however, the court concluded that "Dr. Smelko's conflicting and incomplete conclusions and diagnoses" supported keeping the case in the District Court. The court explained that Dr. Smelko had conducted new psychological testing on Talksabout's intellectual functioning that demonstrated he was comparable to an eight- or nine-year-old child. But the court determined that a "close examination of Dr. Smelko's report reveals that other than baldly concluding that Talksabout has an eight or nine-year old intellectual ability, Dr. Smelko does not actually conclude that he has an intellectual disability as defined by the American Psychological Association and the United States Supreme Court." The District Court expressed deep concern regarding Dr. Smelko's opinion that Talksabout fit the hostile masculinity syndrome personality profile. The court quoted a treatise that the State had referenced in cross-examining Dr. Smelko on this diagnosis:

> Hostile masculinity syndrome refers to a personality profile that includes interrelated attitudes and emotions that may be grouped within two primary components: The first consists of hostile, distrustful, insecure feelings toward people, particularly women, accompanied by misogynous (woman-hating) attitudes, such as beliefs that rape victims secretly desire to be victimized. The second component consists of a desire to control and dominate women that results in deriving sexual arousal and gratification from such domination

14

over women. Men who have such a syndrome typically also have an insecure sense of masculinity and are hypersensitive to rejection from women. They are frequently highly narcissistic as well.

The court acknowledged that from a punitive perspective, adult penalties were not in Talksabout's best interest. The court concluded, however, that from a rehabilitative perspective, Talksabout required treatment—treatment that likely could not be completed if the case were handled in Youth Court. Because effective treatment was in Talksabout's best interest, the court concluded that this factor weighed against transferring the case to Youth Court.

¶28 On appeal, Talksabout contends that the District Court abused its discretion in denying transfer of the second sexual intercourse without consent charge to Youth Court for reasons similar to its denial on the first charge. Talksabout again asserts that the court's findings were not supported by substantial evidence. Talksabout argues that the District Court acted arbitrarily in affording Dr. Smelko's report limited weight. He again relies heavily on Dr. Smelko's testimony and asserts that Dr. Smelko demonstrated that Talksabout was developmentally immature and required treatment as a youth. Thus, Talksabout contends that the evidence regarding his best interests was not conflicting. Talksabout argues that the District Court erred in relying on the probation officer's testimony in analyzing the interests of community protection because, in Talksabout's view, the probation officer was focused on adult supervision and failed to account for the specifics of this case.

¶29 Talksabout emphasizes Dr. Smelko's testimony and the weight the District Court accorded that evidence; but he overlooks that it is the District Court's role to weigh and

resolve conflicts in the evidence before it. *Dietsch*, ¶¶ 15-16. That the State did not call its own expert is of no moment; "[a] factfinder remains free to disregard an expert's testimony." *Willis v. Fertterer*, 2013 MT 282, ¶ 35, 372 Mont. 108, 310 P.3d 544 (citing *Stave v. Estate of Rutledge*, 2005 MT 332, ¶ 21, 330 Mont. 28, 127 P.3d 365). The State points out that all of the evidence the District Court found concerning "at the first hearing about the nature of the offense and interests of community protection became even more concerning at the second hearing, since Talksabout's two offenses were remarkably similar." Dr. Smelko had conducted additional testing since the first transfer hearing and acknowledged on cross-examination that Talksabout was impulsive, could be expected to entertain potentially dangerous risks to himself and others—including sexual behaviors—and has a pattern of sexually abusive behavior. The additional evidence presented at the second transfer hearing heightened the District Court's concerns and provided further evidence substantiating its findings on those two statutory factors.

¶30     There also was substantial evidence supporting the District Court's conclusion that retaining the second charge was in Talksabout's best interests. As the court noted, Dr. Smelko "reache[d] important conclusions on Talksabout's risk," including that Talksabout was a moderate risk to reoffend, his behavior was "likely to be reckless," and he was "quite impulsive and prone to behaviors likely to be self-harmful or self-destructive." These observations support the District Court's conclusion that the treatment and supervision that could be provided under the auspices of the District Court were in Talksabout's best interest. Moreover, the District Court did not exceed the bounds of reason when it relied on Dr. Smelko's own conclusion that Talksabout fits the hostile

16

masculinity syndrome personality profile. These were serious concerns that changed Dr. Smelko's assessment of Talksabout's recidivism risk. These concerns provide additional support for the District Court's conclusion that Talksabout would require more intensive supervision and treatment than the Youth Court could provide. Accordingly, we conclude that the District Court did not abuse its discretion in denying Talksabout's second transfer motion.

¶31 *2. Whether the District Court erred in sentencing Talksabout.*

¶32 A youth who has been charged and convicted in district court must be sentenced pursuant to § 41-5-2503, MCA. Section 41-5-206(6), MCA. In sentencing the youth, the district court must:

> (b) retain jurisdiction over the case until the criminally convicted youth reaches the age of 21;
>
> (c) order the department to submit a status report to the court, county attorney, defense attorney, and juvenile probation officer every 6 months until the youth attains the age of 21. The report must include a recommendation from the department regarding the disposition of the criminally convicted youth.

Section 41-5-2503(1)(b)-(c), MCA. Talksabout contends, and the State concedes, that the case should be remanded to the District Court with instructions to modify the judgment in accordance with these requirements. The State does not agree with Talksabout, however, that § 41-5-2503(2), MCA, also requires the District Court to review Talksabout's sentence before he turns twenty-one. The State argues that § 41-5-2510(1), MCA, "specifically excludes" Talksabout from the sentence review process provided for in § 41-5-2503(2), MCA.

17

¶33    Section 41-5-2503(2), MCA, provides that the "district court *shall* review the criminally convicted youth's sentence pursuant to 41-5-2510 before the youth reaches the age of 21 *if* a hearing has not been requested under 41-5-2510." (Emphasis added.) Section 41-5-2510, MCA, in turn, provides:

> When a youth has been convicted as an adult pursuant to the provisions of 41-5-206, except for offenses punishable by death or life imprisonment or when a sentence of 100 years could be imposed, the county attorney, defense attorney, or youth may, *at any time before* the youth reaches the age of 21, request a hearing to review the sentence imposed on the youth.

Section 41-5-2510(1), MCA (emphasis added).

¶34    In construing statutes, our role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We look "to the plain meaning" of the statute's language. *Eldorado Coop Canal Co. v. Hoge*, 2016 MT 145, ¶ 18, 383 Mont. 523, 373 P.3d 836 (citation and internal quotes omitted). And we interpret a statute "as a part of a whole statutory scheme and construe it so as to forward the purpose of that scheme." *Eldorado Coop Canal Co.*, ¶ 18 (citation and internal quotes omitted). Courts must construe the Criminally Convicted Youth Act in a manner that effectuates the following express legislative purposes:

(1) to protect the public;

(2) to hold youth who commit offenses that may be filed directly in district court pursuant to 41-5-206 accountable for their actions;

(3) to provide for the custody, assessment, care, supervision, treatment, education, rehabilitation, and work and skill development of youth convicted in district court; and

(4) to comply with the legislative purposes set forth in 41-5-102.

Section 41-5-2502, MCA.

¶35    It is undisputed that the State charged and convicted Talksabout as an adult pursuant to § 41-5-206, MCA. As the State points out, the District Court could have sentenced Talksabout to one hundred years for his sexual intercourse without consent conviction. Section 45-5-503(2), MCA (prescribing sentencing requirements for sexual intercourse without consent). Thus, under the plain language of § 41-5-2510(1), MCA, Talksabout could not, "at any time" prior to reaching the age of twenty-one, "request a hearing to review the sentence imposed on [him]." The fact that the statute prohibited Talksabout from requesting an earlier hearing does not, however, bar his sentence from being reviewed. The plain language of § 41-5-2503(2), MCA, provides that "if a hearing has not been requested under 41-5-2510," then the District Court must still "review [Talksabout's] sentence pursuant to 41-5-2510 before [he] reaches the age of 21."

¶36    The statute requires the court to hold a hearing within ninety days after a request for hearing is filed "or" the court determines that a sentence review hearing "is required under 41-5-2503." Section 41-5-2510(2), MCA. After considering evidence presented at the hearing, as well as records pertaining to the youth and any statements from the victim, the youth's parents or guardian, or other advocates for the youth, the court is required to determine whether a preponderance of the evidence shows that "the criminally convicted youth has been substantially rehabilitated." Section 41-5-2510(4), MCA. If it makes a determination of substantial rehabilitation, the sentencing court "shall determine whether to:

19

(a)  suspend all or part of the remaining portion of the sentence, impose conditions and restrictions pursuant to 46-18-201, and place the youth on probation under the direction of the department, unless otherwise specified;

(b)  impose all or part of the remaining sentence and make any additional recommendations to the department regarding the placement and treatment of the criminally convicted youth; or

(c)  impose a combination of options allowed under subsections (5)(a) and (5)(b), not to exceed the total sentence remaining.

Section 41-5-2510(5), MCA.  These statutes guarantee that a criminally convicted youth has at least one opportunity for the sentencing court to review his rehabilitative progress and either reaffirm or revise his sentence when he turns twenty-one.

¶37  Our interpretation of the Criminally Convicted Youth Act furthers the statutory scheme.  The Criminally Convicted Youth Act's express purposes include protection of the public, holding youth accountable for their crimes, and providing "for the custody, assessment, care, supervision, treatment, education, rehabilitation, and work and skill development of youth *convicted in district court*."  Section 41-5-2502(3), MCA (emphasis added).  The Act further ties its "express legislative purposes" to those set forth in the Youth Court Act's § 41-5-102, MCA.  Section 41-5-2502(4), MCA.  In other words, the Act does not just shuffle a youth off to the adult offender system and forget about his age.  The rehabilitative goals of both the Youth Court Act and the Criminally Convicted Youth Act follow the youth until he or she reaches the age of twenty-one and the District Court makes an express determination whether to finally impose the full adult sentence.  Prohibiting the District Court from reviewing Talksabout's sentence would defeat the statutory scheme and render pointless the provisions requiring status reports and a

20

"recommendation from the department regarding the [youth's] disposition" to facilitate the sentencing court's review. Section 41-5-2503(1)(c), MCA.

¶38 We conclude that the District Court erred by not including the requirements found in 41-5-2503(1), MCA, in Talksabout's sentence. On remand, because Talksabout turned 21 while this appeal was pending, the District Court must review his sentence pursuant to § 41-5-2510, MCA.

## CONCLUSION

¶39 We affirm the District Court's orders denying Talksabout's transfer motions. We remand to the District Court to amend the judgment and review Talksabout's sentence consistent with this opinion.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


Justice Dirk M. Sandefur, dissenting.

¶40 I dissent from the Majority's resolution of Issue 1 affirming the District Court's refusal to transfer these matters from district court for youth court prosecution and disposition. In refusing to transfer these matters from the District Court to youth court pursuant to § 41-5-206(3), MCA, the District Court erroneously viewed R.T.'s guilt as a fait accompli with the transfer hearings as a springboard to a lengthy prison sentence under the guise that a district court prosecution was a more appropriate forum *for his supervision*

*and rehabilitation*. While the statutory transfer criteria require district courts to consider various circumstances in the event that a youth is guilty, we should not stamp our imprimatur on a process gone awry in contravention of the evidence, the express purposes of the Act, and a youth's fundamental rights to the presumption of innocence and to remain silent. I would: (1) reverse the District Court's transfer hearing orders, thus defaulting these cases to district court jurisdiction due to the expiration of the primary jurisdiction of the youth court at R.T.'s current age of 21, *see State v. Beach*, 217 Mont. 132, 142-44, 705 P.2d 95, 100-02 (1985) (default district court jurisdiction over felony offenses under Mont. Const. art. VII, § 4(1) and §§ 3-5-302(1)(a) and 46-2-201, MCA), *abrogated on other grounds*, *State v. Cope*, 250 Mont. 387, 395-96, 819 P.2d 1280, 1285 (1991); (2) vacate R.T.'s district court sentence; and (3) remand to the District Court to order a comprehensive Department of Corrections status report pursuant to § 41-5-2503(1)(c), MCA, and for immediate resentencing on R.T.'s prior guilty plea through a criminally convicted youth sentence review hearing and findings pursuant to §§ 41-5-2503(2), -2510(4), and -2510(5), MCA.

¶41 This consolidated case began as two separately charged incidents of sexual intercourse without consent that occurred about a month apart. The first charged offense (first case) involved a 14-year-old female victim (A.C.) and occurred when R.T. was 17 years old. The second charged incident (second case) involved a 12-year-old female victim (D.P.) and actually occurred about a month before the first case when R.T. was 16 years old. Both incidents similarly occurred at underage parties where R.T. and each victim eventually went into isolated rooms together. In the first case, alone with the intoxicated

22

14-year-old victim, R.T. undressed her and, after an unsuccessful attempt at penile-vaginal intercourse, subjected her to digital-vaginal intercourse. In the second case, alone with the 12-year-old victim, R.T. undressed her and, despite her having said no, subjected her to penile-vaginal intercourse.

¶42 Due to the youth's age at the time of the alleged offenses, the State charged both cases directly in district court rather than youth court. *See* § 41-5-206(1), (2), MCA. In each case, the Youth Court Act then required an immediate transfer hearing to determine whether prosecution would be more appropriate in youth court rather than in district court. Section 41-5-206(3), MCA. Upon a hearing, a district court may transfer the prosecution of a youth back to youth court only if it finds by a preponderance of the evidence that:

[1]  a youth court proceeding and disposition will serve the interests of community protection;

[2]  the nature of the offense does not warrant prosecution in district court; and

[3]  [a youth court prosecution would be in the youth's] best interests.

Section 41-5-206(3), MCA. The Act requires courts to interpret and construe the statutory transfer criteria "*to effectuate*" its "express legislative purposes." Section 41-5-102, MCA (emphasis added); *see also State ex rel. Matter of D.M.B. v. Mont. Thirteenth Judicial Dist. Youth Court*, 2004 MT 335, ¶ 12, 324 Mont. 190, 103 P.3d 514 (recognizing mandate of § 41-5-102, MCA). The court must also apply and assess the transfer criteria in accordance with a youth's fundamental constitutional rights to the presumption of innocence and to remain silent. *See* § 41-5-102(4), MCA (court must construe and interpret Act in accordance with youth's "constitutional and statutory rights").

23

¶43 In separate written orders for each transfer hearing, the District Court separately addressed each of the three statutory transfer criteria. The District Court's findings and conclusions were essentially the same on each criterion in both hearings except for additional findings applicable to the second transfer hearing as noted herein. I address the District Court's findings and conclusions in kind.

### 1. *Interests of Community Protection -- § 41-5-206(3)(a), MCA.*

¶44 Pursuant to § 41-5-206(3)(a), MCA, the court must determine whether a youth court disposition "will serve the interests of community protection." In support of its ultimate § 41-5-206(3)(a) finding in the first case, the District Court found that the district court was "a more appropriate forum *to supervise*" R.T. based on his "age, home environment, conduct while on release, minimization of his alleged conduct, and need for more structured supervision." (Emphasis added.) In the second case, the District Court similarly found that the district court was "a more appropriate forum *to . . . rehabilitate*" R.T. based on his "age, home environment, conduct while on release, minimization of his alleged conduct, risk to reoffend and need for more structured supervision." (Emphasis added.)[1] The stated bases for the District Court's ultimate § 41-5-206(3)(a) findings were substantially the same except for R.T.'s upgraded risk to re-offend as an additional consideration in the second case.

---

[1] Taken literally, the District Court's express written findings that the district court was "a more appropriate forum" to supervise and rehabilitate R.T. are not the specific findings contemplated by § 41-5-206(3)(a), MCA, that "a youth court proceeding and disposition will [or will not] serve the interests of community protection." This Court nonetheless construes it as a negative finding on the mandatory § 41-5-206(3)(a) criterion.

24

¶45 In both cases, the District Court found that a district court prosecution was "a more appropriate forum" due to R.T.'s "advanced age." At the time of the first transfer hearing, R.T. was "less than two months" short of his 18th birthday. He was 18 at the time of the second transfer hearing. The primary youth court jurisdiction extends until a youth is 21 years old with the option of extending probation, subject to district court supervision and adult consequences, until age 25. Sections 41-5-205(1) and -208, MCA. The District Court found R.T.'s age significant because he would not be able to complete sex offender treatment before age 18, "protecting the community is more challenging with older youths," and sex offender registration "is not required" for a youth court disposition.

¶46 In the first case, the District Court based its community protection finding on Chief Juvenile Probation Officer Tim Callahan's general statement that "the older the youth is, the more challenging it can become to deal with." However, in context, the complete substance of Callahan's testimony was that supervision of older sex offenders can be challenging in youth court *if the youth is unable to complete sex offender treatment by age 21 or, at the latest, age 25*. The District Court's findings inexplicably glossed over Callahan's specific testimony that "we could get [R.T.'s sex offender treatment] done" and "*we can protect the community even within the juvenile system*." (Emphasis added.) The State presented, and the District Court cited, no evidence to the contrary. The District Court did not find, and the evidentiary record is insufficient for an implied finding, that R.T. could not or would not complete required sex offender treatment by age 21 or, at the latest, age 25 under youth court supervision. The District Court similarly did not find, and

the evidentiary record is similarly insufficient for an implied finding, that a youth court supervision would not serve the interests of community protection contrary to the unequivocal and unrebutted testimony of the Chief Probation Officer and Dr. Bowman Smelko, Psy.D, ABPP.[2] The hearing record was simply devoid of any conflicting evidence to weigh. The District Court clearly mischaracterized or, at least, misapprehended the first hearing evidence regarding the suitability of a youth court supervision to serve the interests of community protection. Review of the record clearly manifests that the District Court made a mistake.

¶47 The District Court similarly mischaracterized or misapprehended the import of the distinction between district court and youth court sex offender registration. The District Court inaccurately characterized sex offender registration as "not required" in youth court. As a matter of law, sex offender registration is mandatory in youth court unless the court specifically finds that "registration is not necessary" to protect the public and exemption of a youth "is in the public's best interest." Sections 46-23-504(1), 41-5-1513(1)(d), MCA. If the youth court does not exempt a youth from sex offender registration, the youth, like an adult offender, must then register for the remainder of his or her life unless the court later relieves the registration requirement in the public interest after a period of 10 years for Level 1 (low risk) offenders or after 25 years for Level 2 (moderate risk) offenders. *See*

---

[2] Dr. Smelko is an independent MSOTA-qualified, board certified forensic psychologist. For persons convicted of sex offenses, district court presentence investigation reports and youth court predispositional reports must include a psychosexual evaluation conducted by a member of the Montana Sex Offender Treatment Association (MSOTA). Sections 46-18-111(1)(b), 46-23-509(2), and 41-5-1513(2)(a), MCA.

§ 46-23-506, MCA; *compare* §§ 46-23-504(1) *with* 41-5-1513(1)(d), MCA. Thus, the District Court's mischaracterization, or at least, misapprehension of the import of the distinction between district court and youth court sex offender registration clearly did not support its ultimate finding that a youth court proceeding would not serve the interests of community protection. The District Court mistakenly relied on that insignificant distinction as a basis for its required § 41-5-206(3)(a) finding that a youth court prosecution would not serve the interests of community protection.

¶48 Strangely enough, the State did not recall the Chief Probation Officer to testify at the second transfer hearing. It instead presented, and the District Court relied on, the opinion of Montana Department of Corrections Adult Probation and Parole (AP&P) Officer Susan Carroll who essentially testified that a district court prosecution would *better* serve the interests of community protection due to the challenge of "supervising adult sex offenders,"[3] the more punitive district court probation violation consequences, and because it was then apparent that R.T. had committed two offenses rather than one. However, R.T. was not an "adult sex offender." As a matter of fact, he was a juvenile sex offender subject to potential district court supervision as an adult.[4] Regardless of this fine distinction, the District Court's findings reference only the AP&P officer's general statements that R.T.'s age "makes treatment more difficult," he "might not complete treatment," and R.T. "has a negative attitude toward treatment."

---

[3] Second Transfer Order, p. 4.

[4] As a matter of law, he was potentially a "criminally convicted youth" under § 41-5-2501, MCA, *et seq*. (Criminally Convicted Youth Act).

27

¶49 Except for the potentially longer supervision period and punitive probation violation consequences in district court, neither the AP&P officer's testimony, nor the District Court's findings, state or indicate any reason why, how, or on what basis district court supervision of R.T.'s compliance with sex offender treatment or other probation conditions would better protect the public than youth court supervision of those same conditions. The risk that that R.T. "might not" timely complete sex offender treatment was highly speculative and, in any event, the same in district court as in youth court. The State presented, and the District Court found, no particularized non-speculative evidence that the youth court jurisdiction would be insufficient to protect the public by ensuring that R.T. would timely complete required sex offender treatment before age 21 or, at the latest, age 25. To the contrary, despite her stated concerns and preference for a district court prosecution, the AP&P officer grudgingly admitted at the second hearing that the youth court could safely supervise R.T. in the community. The State presented no evidence to the contrary. In light of her grudging admission regarding the capability of a youth court supervision, the AP&P officer's *mere preference* for a district court supervision was hardly sufficient to contradict or outweigh the unequivocal testimony of Dr. Smelko, and the similarly unequivocal earlier testimony of the Chief Probation Officer, that the youth court could safely supervise R.T. in the community. Thus, the mere facts of R.T.'s age, the possibility that he might violate his sex offender treatment or other probation conditions, and that district court probation violation consequences were more punitive clearly did not support the District Court's § 41-5-206(3)(a) finding that a youth court prosecution would not serve the interests of community protection.

28

*R.T.'s Home Environment and Need for More Structured Supervision*

¶50    In further support of its findings that a district court prosecution was a "more appropriate forum" to supervise and rehabilitate R.T., the District Court found that R.T. had little family "structure or discipline" and needed more structured supervision. The District Court based this finding on the facts that R.T.'s elderly grandmother had raised him since birth, he dropped out of school at 16 to assist her, and he snuck out of his grandmother's home late at night to go to the underage drinking party where the incident with the 14-year-old victim occurred.

¶51    However, other than a ticket for failing to wear a helmet at a skate park, R.T. had no prior criminal record. The State presented no evidence indicating that R.T. had any prior delinquent, violent, predatory, deviant, mentally unstable, or anti-social history or tendencies. Regardless of his ultimate guilt or innocence in this case, the fact that, like most Montanans, R.T. was not raised in an idyllic nuclear family setting did not ipso facto make him a risk to community safety. The State presented no evidence that R.T.'s imperfect family structure increased any case-related risk that he might commit another sex offense, that youth court supervision could not adequately protect the community from that risk, or that district court supervision could better protect the community from that risk. Whether subject to district court or youth court supervision, a probation officer would closely supervise R.T. on probation. The State presented, and the District Court found, no evidence indicating that district court supervision would provide more structure for community protection than youth court supervision. Thus, R.T.'s imperfect family structure clearly did not support the District Court's ultimate finding under

29

§§ 41-5-206(3)(a) and -102, MCA, that a youth court proceeding would not serve the interests of community protection. Upon review of the record, the District Court mistakenly relied on R.T.'s imperfect family structure as a basis for its § 41-5-206(3)(a) finding that a youth court prosecution would not serve the interests of community protection.

*R.T.'s Conduct While on Release*

¶52    In further support of its findings that a district court prosecution was a "more appropriate forum" to supervise and rehabilitate R.T., the District Court found that he had "absconded" by failing to appear for court and had committed a new shoplifting offense while earlier released on his own recognizance.  However, the District Court made no finding as to the *reason* for R.T.'s failure to appear for the earlier hearing, whether due to his own irresponsible disregard, lack of notice, or miscommunication with appointed counsel or his grandmother.  There was certainly no finding that R.T. ran away from home for any significant period or that he attempted to flee to avoid prosecution.  The District Court's finding that R.T. "absconded" was a dramatic overstatement of the evidence.  The District Court's findings are also conspicuously devoid of any finding, or sufficient record basis for an implied finding, indicating any logical nexus between R.T.'s sex offense recidivism risk and his earlier failure to appear for a hearing or the unrelated misdemeanor shoplifting offense.  Thus, R.T.'s failure to appear for a hearing and the unrelated shoplifting offense clearly did not support the required finding under § 41-5-206(3)(a), MCA, that a youth court proceeding would not serve the interests of community protection. Upon review of the record, the District Court's reliance on those considerations as bases for its § 41-5-206(3)(a) finding in favor of a district court prosecution was clearly mistaken.

*R.T.'s Minimization and Rights to Presumption of Innocence and to Remain Silent*

¶53    In both transfer orders, the District Court found that R.T.'s "minimization of his alleged conduct" supported its ultimate § 41-5-206(3)(a) finding that the district court was a "more appropriate forum" to supervise and rehabilitate him.  The District Court found

that R.T. minimized his "alleged conduct" in statements taken from Dr. Smelko's pre-adjudication psychosexual evaluation report, paraphrased in the report and listed in the District Court's findings as follows:

- I am the real victim in the current situation
- I do not agree with the police report describing my offenses
- I do not believe my sexual behavior messed up my victim
- I do not have a sexual problem [sic] to work out and treatment
- I am not willing to enter treatment
- I never sexually offended against this person

In essence, the District Court found that the youth court could not safely treat and supervise R.T. because he: (1) continued to deny his guilt; (2) denied that he needed sex offender treatment; and (3) would not willingly submit to sex offender treatment.

¶54    As a threshold matter, no connective record facts bridge the vast evidentiary divide between the mere fact that R.T. continued to deny guilt and its consequences *under a pre-conviction not guilty plea* and the postconviction likelihood that he would be more able or willing to complete sex offender treatment and probation under youth court or district court supervision. In the manifest absence such a critical evidentiary bridge, the mere fact of R.T.'s continued denial of guilt and its consequences was simply not probative of whether he would or would not have been less likely to successfully complete sex offender treatment and probation under youth court supervision than district court supervision. Further compounding this manifest evidentiary shortfall was the unrebutted testimony of Dr. Smelko and the Chief Juvenile Probation Officer, with the AP&P officer's grudging admission, that the youth court *could* safely treat and supervise R.T. in the community. On this basis alone, R.T.'s pre-adjudication "minimization of his alleged conduct" clearly does

32

not support the District Court's finding that a youth court prosecution would not serve the interests of community protection. Thus, to the extent based on R.T.'s pre-adjudication minimization of his conduct, the District Court's adverse § 41-5-206(3)(a) finding was clearly erroneous.

¶55 However, the District Court's focus on R.T.'s pre-adjudication denial of guilt and its consequences is even more problematic. Regardless of whether the rules of evidence technically apply at youth court transfer hearings,[5] youth have fundamental federal and state constitutional rights to the presumption of innocence and to remain silent. *In re Winship*, 397 U.S. 358, 365-68, 90 S. Ct. 1068, 1073-75 (1970) (recognizing due process right to proof of guilt beyond a reasonable doubt in juvenile delinquency proceedings); *In re Gault*, 387 U.S. 1, 47-55, 87 S. Ct. 1428, 1454-58 (1967) (recognizing 5th and 14th Amendment right to remain silent in juvenile delinquency proceedings); Mont. Const. art. II, §§ 15, 17, 25 (rights of minors, due process, right to remain silent); § 41-5-1502(2), MCA (right to proof of guilt beyond a reasonable doubt); § 41-5-102(4), MCA (court must construe and interpret Youth Court Act in accordance with youth's "constitutional and statutory rights").

¶56 In its first transfer order, the District Court resorted to R.T.'s "minimization" to try to offset Dr. Smelko's testimony that R.T. presented a low risk to reoffend and that the youth court could safely treat and supervise him in the community. In the second transfer

---

[5] Given the fundamental liberty interests affected and the potential for lifetime adverse consequences to youth, it is an indefensible travesty that this Court has yet to unequivocally mandate enforcement of the rules of evidence in youth court transfer hearings.

33

hearing, with the additional reference to the AP&P officer's testimony that R.T. "has a negative attitude toward [sex offender] treatment," the District Court again relied on the "minimization" to offset Dr. Smelko's testimony that, despite the upgrade of R.T.'s risk-tier designation to a Level 2 (moderate risk to re-offend),[6] the youth court could still safely treat and supervise him in the community.

¶57 The sole purpose of a youth court transfer hearing is to determine whether the prosecution should proceed in district court or youth court. *See* § 41-5-206(3), MCA. While the statutory transfer criteria necessarily require the district court to assess a youth's circumstances in the event of a conviction, the court may not apply or assess them in a manner that contravenes or imposes adverse consequences on a youth's exercise of his or her fundamental rights to remain silent and to the presumption of innocence. Despite perfunctory recognition that R.T. "ha[d] not pled guilty," the District Court's consideration of R.T.'s refusal to admit guilt, and its consequences, as a basis for the District Court's adverse § 41-5-206(3)(a) finding violated R.T.'s rights to the presumption of innocence and to remain silent.

¶58 Recognizing this problem, the State asserts on appeal that R.T. waived his rights by presenting Dr. Smelko's testimony. However, nothing in Dr. Smelko's testimony, his report, or the District Court's findings indicates any statement by R.T. directly or indirectly admitting guilt. To the contrary, the problem was that the District Court penalized R.T. for *not* admitting guilt and accepting the consequences thereof. Thus, the State's implied

---

[6] *See* § 46-23-509(2), MCA (Montana Sexual or Violent Offender Registration Act (SVOR) risk-tier designations).

34

waiver theory had no application to the District Court's infringement of R.T.'s rights to the presumption of innocence and to remain silent based on his refusal to admit guilt or accept the consequences of guilt.[7]

¶59 The State's waiver theory applies, if at all, only to the threshold disclosure of R.T.'s statements. By analogy, the youth court may order a pre-dispositional "psychological evaluation" of a youth "if the youth waives the youth's constitutional rights in the manner provided for in" § 41-5-331, MCA. Section 41-5-1503, MCA. At the time of the pre-adjudication psychosexual evaluation, R.T. was a 17-year-old high school dropout. There is no evidence that he affirmatively waived his right to remain silent at or prior to the evaluation. There is no evidence that counsel assisted R.T. at the evaluation. R.T. did not testify at either hearing and did not affirmatively waive his right to remain silent on either hearing record. Dr. Smelko was an independent MSOTA-qualified mental health expert apparently commissioned by defense counsel. He was not R.T.'s agent or treating medical provider. There is no evidence that anyone counseled or advised R.T. that statements made to Dr. Smelko in that clinical setting could potentially be used against him in court. Dr. Smelko's testimony did not reference or otherwise introduce R.T.'s statements into the hearing record. Neither the State, nor defense counsel, offered Dr. Smelko's report into evidence. The Court demanded to see the report *sua sponte*.

---

[7] Further illustrating the manifest fundamental fairness need for application of the rules of evidence to youth transfer hearings, R.T.'s statements, as recounted in Dr. Smelko's evaluation report, were inadmissible double-hearsay. *See* M. R. Evid. 801(c), 802, and 805.

35

Under the totality of the circumstances, R.T. did not waive his right to remain silent based on defense counsel's mere presentation of Dr. Smelko's testimony.

¶60 The District Court's improper consideration of his refusal to admit guilt and its consequences was highly prejudicial. It was a, if not the, central justification for the District Court's § 41-5-206(3)(a) finding that a youth court prosecution would not serve the interests of community protection. Thus, to the extent based on R.T.'s pre-adjudication minimization of his conduct, the District Court's adverse § 41-5-206(3)(a) finding was independently erroneous as a matter of law in violation of R.T.'s fundamental rights to the presumption of innocence and to remain silent.

*Multiple Offenses and More Punitive District Court Consequences*

¶61 In further support of its second hearing finding that a district court prosecution was a "more appropriate forum" to rehabilitate R.T., the District Court's findings gave significant weight to AP&P Officer Susan Carroll's opinion that a district court prosecution would better serve the interests of community protection because R.T. was now accused of two sex offenses and a district court prosecution had more punitive consequences. Indeed, the fact that R.T. was accused of two sex offenses involving minors in the span of a month was obviously a valid community protection concern. However, the exclusive focus of the parties and the District Court at both transfer hearings was whether a district court or youth court *supervision* would best serve the interests of community protection.[8] Nowhere in the

---

[8] *See* First Transfer Order pp. 5-6 (finding district court "a more appropriate forum to . . . *supervise*" R.T.) (emphasis added) and Second Transfer Order pp. 5-6 (predicate findings in re AP&P officer's preference more punitive court consequence and ultimate finding that district court was "a more appropriate forum to . . . *rehabilitate*" R.T.) (emphasis added).

36

record is there any suggestion, evidence or court finding that an unsuspended prison sentence of any length might be necessary to serve the interests of community protection.[9]

¶62 Even as to probation, it was not enough for the District Court to merely consider whether district court probation violation consequences were "more appropriate" than youth court consequences. If the focus of a transfer hearing becomes the sufficiency of probation violation consequences, § 41-5-206(3)(a), MCA, still requires the court to consider whether youth court probation violation consequences, including adult supervision and potential imprisonment until age 25, would "serve the interests of community protection." *See* § 41-5-102(2), MCA (Act must be interpreted and construed "to effectuate" its express remedial purpose of providing "avoidable consequences" for misconduct through "supervision, care, rehabilitation, detention, competency development, and community protection"); *see also D.M.B.*, ¶ 12. In no other way can courts balance the Youth Court Act's dual, but not necessarily competing, purposes of youth remediation and public protection.

¶63 Here, the evidence that the youth court could safely treat and supervise R.T. in the community was the *only* specific community protection *evidence* at either transfer hearing. At the first hearing, the evidence was the unqualified opinions of the independent, MSOTA-qualified psychosexual expert and the Chief Juvenile Probation Officer. At the second hearing, the evidence was the unqualified opinions of the psychosexual expert and

---

[9] Yet, after R.T. pled guilty, without any material change in the quantum or quality of adverse evidence than existed at the time of the second transfer hearing, the District Court ultimately sentenced the 18-year-old to 50 years in the Montana State Prison with only 10 years suspended.

the admission of the AP&P officer. In light of her admission that the youth court could safely supervise R.T. in the community, the AP&P officer's stated preference for a district court prosecution clearly did not support the required § 41-5-206(3)(a) finding that a youth court disposition would not serve the interests of community protection.

¶64 In advance of the second transfer hearing, Dr. Smelko upgraded R.T.'s SVOR risk-tier designation from a Level 1 (low risk to reoffend) to a Level 2 (moderate risk to re-offend), but nonetheless maintained his unequivocal opinion that the youth court could safely treat and supervise R.T. in the community. The State presented no contrary expert testimony or other evidence. In contrast to the District Court's *sua sponte* critique of Dr. Smelko's opinion that a youth court prosecution would be in R.T.'s best interests, the District Court's findings did not dispute Dr. Smelko's still unrebutted opinion that the youth court could safely treat and supervise R.T. in the community. Thus, without more, the mere facts that R.T. was now accused of two sex offenses and that the district court had more punitive probation violation consequences clearly did not support the required finding under § 41-5-206(3)(a), MCA, that a youth court proceeding would not serve the interests of community protection. Upon review of the record, the District Court mistakenly relied on those considerations as bases for its § 41-5-206(3)(a) finding in favor of a district court prosecution.

¶65 In summary, the District Court's ultimate § 41-5-206(3)(a) finding that a youth court proceeding would not serve the interests of community protection is clearly erroneous as matter of fact. The evidence in the transfer hearing records clearly supported an affirmative finding that a youth court proceeding and disposition would serve the interests of

38

community protection. The District Court's finding is also independently erroneous as a matter of law in violation of R.T.'s fundamental rights to the presumption of innocence and to remain silent.

### 2. *Nature of the Offense -- § 41-5-206(3)(b), MCA.*

¶66 Pursuant to § 41-5-206(3)(b), MCA, the court must determine whether the "nature of the offense does not warrant prosecution in district court." In current form, the Youth Court Act lists 21 felony offenses that require initial filing in district court for youths who were 17 years old at the time of commission of one of the listed offenses. Section 41-5-206(1), (2), MCA. By legal consequence and factual nature, these offenses are the most serious offenses under Montana law. Consequently, as a mandatory condition precedent for transfer of any of these cases from district court back to the youth court, the district court must find that "the nature of the offense does not warrant prosecution in district court." Section 41-5-206(3)(b), MCA. The Act provides no specific criteria or standard to guide the court, or inform youths, on what basis or under what circumstances the "nature" of these most serious offenses would "not warrant prosecution in district court." However, as an overarching guide, the district court must still construe and interpret § 41-5-206(3)(b), MCA, "to effectuate" the "express legislative purposes" of the Youth Court Act. Section 41-5-102, MCA.[10]

---

[10] In addition to effecting the remedial purposes of the Act, § 41-5-102, MCA, constitutionally saves § 41-5-206(3)(b), MCA, by providing general standards that limit otherwise unbridled, *i.e., arbitrary*, discretion in determining whether a particular case warrants prosecution in district court or youth court. *See State v. G'Stohl*, 2010 MT 7, ¶ 9, 355 Mont. 43, 223 P.3d 926 (law defectively vague per U.S. and Montana Constitutions if so vague that it authorizes or encourages arbitrary application); *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03, 86 S. Ct. 518, 520-21, (1966) (state

¶67    In the first case, the District Court based its § 41-5-206(3)(b) finding on the seriousness of the alleged facts that the 17-year-old R.T.: (1) knew the victim was only 14 years old; (2) encouraged her to use "intoxicants"; and (3) undressed and subjected her to digital and penile intercourse without her consent while she was intoxicated.   On the hearing record and in its subsequent written order, the District Court then further found "repugnant" what it perceived as victim-blaming and a false distinction between "date rape" and "forcible rape."   In the second case, the District Court exclusively focused on the seriousness of alleged facts that the 16-year-old R.T.: (1) "may have been under the influence of marijuana"; (2) knew the victim was only 12 years old; and (3) removed the victim's clothes and subjected her to intercourse over her verbal protests and physical resistance.

¶68    However, mere focus on the seriousness or severity of the alleged facts is not enough under § 41-5-206(3)(b), MCA.  As a matter of law, courts must carefully consider whether, despite the serious nature of the alleged facts, a youth court proceeding could accomplish or effect the Act's express non-punitive, remedial purposes to:

(1)    provide "immediate, consistent, enforceable, and avoidable consequences" for misconduct through "supervision, care, rehabilitation, detention, competency development, and community protection;" and

(2)    maintain youth "in a family environment whenever possible, separating the youth . . . only when necessary for the welfare of the youth or for the safety and protection of the community."

law must have "understandable meaning with legal standards" enforceable without resort to subjective "notions of what the law should be"); *Margaret S. v. Edwards*, 794 F.2d 994, 999 (5th Cir. 1986) (state law affecting liberty interest is void for vagueness if "inherently standardless" and enforceable only on unlimited, arbitrary discretion).

Section 41-5-102(2) to (3), MCA; *see also D.M.B.*, ¶ 12 (mandatory nature of § 41-5-102, MCA); *see also In re J.D.W.*, 267 Mont. 87, 91-94, 881 P.2d 1324, 1327-29 (1994) (erroneous transfer to district court based on reference to longer district court jurisdiction without consideration of adequacy of youth court jurisdiction in re Act's criteria and remedial purposes) (modified in part by statutory amendment). If a youth court prosecution *cannot* accomplish or effect the express purposes of the Act due to the nature of the facts and circumstances of a particular case, then the nature of the case warrants a district court prosecution under § 41-5-206(3)(b), MCA. On the other hand, if a youth court prosecution *can* accomplish or effect the express purposes of the Act despite the serious nature of the facts and circumstances of the case, then the nature of the case warrants a youth court prosecution under § 41-5-206(3)(b), MCA. Though district courts of course have broad discretion to make these determinations on a case-by-case basis, they cannot simply disregard or gloss over them. Unmoored from its express remedial purposes, mere focus on the seriousness of the facts and circumstances of a case would defeat the Act's mandatory legislative purposes and effectively mean that no case with serious or severe facts and circumstances would warrant youth court prosecution under any circumstance. *See In re Stevenson*, 167 Mont. 220, 228-29, 538 P.2d 5, 9-10 (1975).

¶69 Incredibly, the Majority contends that such consideration and balancing of the express legislative purposes of the Act would effect a "new standard" for determining whether the serious nature of an offense would not warrant a district court prosecution under § 41-5-206(3)(b), MCA. The Majority essentially contends that, as a result of the 1997 amendment of § 41-5-206(3), MCA, the "nature of the offense" is now a stand-alone

41

transfer criterion focused solely on a standardless assessment of the severity of the alleged facts of offenses which are already the most serious offenses under Montana law. Conspicuously missing from the Majority analysis is any analysis or explanation indicating any legal standard or factual scenario under which the factual basis for offenses that are already the most serious of offenses would *not* preclude a youth court prosecution under § 41-5-206(3)(b), MCA.

¶70 Even more problematic, the Majority simply ignores the Legislature's express command that courts "interpret and construe" the Youth Court Act "*to effect*" its "express legislative purposes." Section 41-5-102, MCA (emphasis added). How the Majority construes § 41-5-206(3)(b), MCA, to be exempt or excluded from the unqualified mandate of § 41-5-102(2) to (3), MCA, is mystifying. The fact, as asserted by the Majority, that this Court has yet to squarely consider the interplay between §§ 41-5-102(2) to (3) and -206(3)(b), MCA, is a patently insufficient basis to endorse and uphold unfettered district court discretion over the express legislative command of § 41-5-102(2) to (3), MCA. The mandatory language of § 41-5-102, MCA, is not a new standard—it is an old standard that this Court is duty-bound to enforce regardless of the outcome in a particular case.

¶71 Here, in both cases, the District Court's § 41-5-206(3)(b) consideration and findings went no further than noting the seriousness of the offenses and alleged facts. Neither the District Court's findings, nor either of the hearing records, indicate any careful consideration of whether, despite the seriousness of the offenses and factual allegations, a youth court prosecution could accomplish or effect the Act's dual, and not necessarily

42

mutually exclusive, legislative purposes of youth remediation and community protection. Though the District Court correctly found that the alleged facts were serious and egregious in nature, those findings of fact are incomplete under §§ 41-5-206(3)(b) and -102, MCA, without reconciliation with the express legislative purposes of the Act. Thus, whether viewed as an erroneous application of law or based on insufficient evidence, the District Court's ultimate § 41-5-206(3)(b) finding that the nature of these cases warranted district court prosecution was clearly erroneous.[11]

### 3. R.T.'s Best Interests -- § 41-5-206(3)(c), MCA.

¶72 Pursuant to § 41-5-206(3)(c), MCA, the court must determine whether a youth court prosecution would be in the youth's best interests. In the first case, noting Dr. Smelko's unrebutted testimony and the State's failure to present any contradictory evidence, the District Court found that a youth court proceeding would be in R.T.'s best interests due to the inevitable harm that an adult court prosecution would cause to R.T.'s "cognitive and behavioral development." However, in the second case, the District Court contrarily found that "Dr. Smelko's conflicting and incomplete conclusions and diagnoses, the pre-trial nature of his evaluation, [R.T.'s] moderate risk to reoffend, and Dr. Smelko's serious

---

[11] This Court need not separately address the District Court's unnecessarily provocative commentary regarding alleged "victim-blaming" and the "repugnant" false equivalency between "date rape" and "forcible rape." A fair reading of the record clearly indicates that neither Dr. Smelko's risk factor analysis nor defense counsel's related arguments were, or were intended as, victim-blaming or minimization of non-consensual sexual intercourse contrary to Montana law and social mores. Moreover, neither the District Court's findings nor the record indicate how the alleged *after-the-fact* victim-blaming or minimization by an independent MSOTA-qualified mental health professional, or defense counsel, could further aggravate the *prior conduct of the youth* to warrant a punitive district court prosecution.

43

concerns about [R.T.'s] prognosis for intervention (especially the hostile masculinity syndrome) necessitate retention of this case in [d]istrict [c]ourt."[12]

¶73 As a threshold matter, the District Court's reliance on the "pre-trial nature" of Dr. Smelko's evaluation is puzzling. By definition, a youth court transfer hearing is a preliminary, pre-adjudicatory hearing with the sole purpose to determine whether the case should proceed as a district court or youth court prosecution. *See* § 41-5-206(3), MCA. As such, the highly relevant risk factor and amenability to community treatment and supervision analyses of an MSOTA-qualified mental health professional must necessarily be "pre-trial [in] nature." The mere fact that a psychosexual evaluation was a pre-adjudication evaluation does not per se diminish its probative value under § 41-5-206(3), MCA.

¶74 The District Court further assigned "limited weight" to Dr. Smelko's diagnosis of R.T.'s limited "intellectual ability" and risk analysis conclusions because:

> The standards for a psychosexual evaluation prescribed by the Montana Sex Offender Treatment Association provide, "Evaluations received by the pre-sentence investigator that have been performed prior to an admission of guilt by the offender *may not meet the requirements of these Standards.*" *See* Montana Sex Offender Treatment Association, *Standards for Evaluation and Ongoing Assessment of Adult Sexual Offenders*, June 16, 2014, at p. 4.

---

[12] Taken literally, the District Court's express written finding that the referenced considerations "necessitate retention of this case in [d]istrict [c]ourt" is not the specific finding contemplated by § 41-5-206(3)(c), MCA, that a youth court prosecution is, or is not, in the best interests of the youth. This Court nonetheless construes it as a negative finding on the mandatory § 41-5-206(3)(c) criterion.

(Emphasis in original.) However, as manifest in the quotation, the referenced standard disclaimer is applicable only to the *postconviction* MSOTA-qualified psychosexual evaluations required in presentence and predispositional investigation reports. *See also* §§ 46-18-111(1)(b), 46-23-509, 41-5-1513(2), MCA. Though often highly relevant to youth court transfer criteria, the Youth Court Act does not similarly require psychosexual evaluations for pre-adjudication youth court transfer hearings. Moreover, even to the extent pertinent, the cited MSOTA disclaimer says no more than that pre-adjudication psychosexual evaluations *may* not satisfy MSOTA standards. Consequently, at most, a question of fact *may* exist in a particular case as to the MSOTA standard sufficiency of a pre-adjudication evaluation. The District Court did not find, and the record does not reflect, any *evidence* indicating that Dr. Smelko's pre-adjudication psychosexual evaluation did *not* meet MSOTA standards. Neither party, nor the District Court, questioned Dr. Smelko about the subsequently cited MSOTA disclaimer and it was not otherwise at issue at the hearing. The District Court's unsupported reference to the MSOTA disclaimer is no more than speculative innuendo, devoid of probative value on the record in this case. The District Court abused its discretion in speculatively discounting Dr. Smelko's psychosexual evaluation analysis based on the cited MSOTA disclaimer.

¶75 Upon close examination of the predicate findings, the District Court's reference to "incomplete conclusions and diagnoses" referred to Dr. Smelko's diagnoses that R.T. had the "intellectual ability" of an 8 to 9 year old and was "'borderline' mentally retarded." In support of that characterization, the District Court's findings reflect considerable *sua sponte* critique of Dr. Smelko's clinical methodology and reasoning by abstract reference

45

to cited federal authority and internally referenced standards of the American Psychological Association. No record expert testimony supported the critique and the District Court nonetheless relied upon the primary thrust of Dr. Smelko's testimony in any event.

¶76 In that regard, the District Court seized upon "Dr. Smelko's serious concerns about [R.T.'s] prognosis for intervention (especially the hostile masculinity syndrome)." Of obvious concern to himself, the State, and the District Court, Dr. Smelko concluded, upon additional evaluation after the first hearing, that R.T. seems to also fit "the *Hostile Masculinity* [psychological] subtype" characterized by:

> hostile, distrustful, insecure feelings toward people, particularly women, accompanied by misogynous (woman-hating) attitudes, such as beliefs that rape victims secretly desire to be victimized . . . [and the] desire to control and dominate women that results in deriving sexual arousal and gratification from such domination over women.

Based on this serious concern, Dr. Smelko upgraded his prior assessment of R.T.'s risk-tier designation from a Level 1 (low risk to re-offend) to a Level 2 (moderate risk to re-offend). Despite its narrow critique of R.T.'s diagnosed mental disability, the District Court accepted these central conclusions without challenge or qualification.

¶77 Dr. Smelko further testified unequivocally that R.T. needed sex offender treatment regardless of whether supervised by the youth court or district court. Again, the District Court agreed. It expressly found that "from a rehabilitative side [R.T.] requires treatment"—"[e]ffective treatment is in [R.T.'s] best interest." The District Court similarly found that "adult penalties are not in [R.T.]'s best interest . . . that is true in every case." Thus, neither the District Court's express findings nor the hearing record manifest any

46

logical basis for concluding under § 41-5-206(3)(c), MCA, that a youth court prosecution would not be in R.T.'s best interests.

¶78 Even if valid, the District Court's narrow critique of R.T.'s diagnosed mental disability did not undermine or conflict with Dr. Smelko's unrebutted testimony, as noted in the District Court's second hearing findings, that a district court prosecution "will harm [R.T.'s] cognitive and behavioral development and *increase* his risk to reoffend." (Emphasis added.) Any infirmity in Dr. Smelko's mental disability diagnosis similarly did not undermine or conflict with the District Court's own express findings that "effective treatment" was in R.T.'s best interests and that "adult penalties" were not. The District Court made no finding, and the record is devoid of any basis for an implied finding, that a district court prosecution rather than a youth court prosecution was necessary to provide R.T. effective sex offender treatment. The District Court's reliance on its critique of Dr. Smelko's mental disability diagnosis as a basis for its finding that a youth court prosecution would not be in R.T.'s best interests was a non sequitur. Thus, the District Court misapprehended the evidence. Its second hearing § 41-5-206(3)(c) finding that youth court supervision would not be in R.T.'s best interests was clearly erroneous.

### 4. Conclusion

¶79 Consistent with the express legislative purposes of the Youth Court Act, this Court has previously recognized that:

> Adults and youths are different, and so are the court systems that recognize those differences. The U.S. Supreme Court discussed key differences between juveniles and adults in its landmark decisions holding that the death penalty cannot be imposed on juvenile offenders. *Roper v. Simmons*, 543 U.S. 551, 569-71, 125 S. Ct. 1183, 1195-96, 161 L. Ed. 2d 1 (2005);

47

*Thompson v. Oklahoma*, 487 U.S. 815, 833-38, 108 S. Ct. 2687, 2698-2700, 101 L. Ed. 2d 702 (1988). The youth court system was specifically designed to appropriately address the youthful indiscretions resulting from immaturity. The U.S. Supreme Court discussed *how the distinct needs of youths are promoted by ensuring their ongoing access to rehabilitative, rather than punitive, juvenile justice systems.*

*In re G.T.M.*, 2009 MT 443, ¶ 15, 354 Mont. 197, 222 P.3d 626 (emphasis added and citations omitted). This Court has further noted that:

Montana recognizes that youths are to be given special treatment by the courts. The youth court system is designed to promote individual rehabilitation and allow young people to learn positive lessons from their transgressions. In youth court, these young people are not subject to the same criminal sanctions as are adults. An express legislative purpose of the Montana Youth Court Act is "to prevent and reduce youth delinquency through a system that does not seek retribution but that provides: (a) immediate, consistent, enforceable, and avoidable consequences of youths' actions; (b) a program of supervision, care, rehabilitation, detention, competency development, and community protection for youth before they become adult offenders[.]" Section 41-5-102(2), MCA[.]

*In re Appeal of Cascade Cnty. Dist. Court*, 2009 MT 355, ¶ 14, 353 Mont. 194, 219 P.3d 1255 (citations omitted, first alteration original).

¶80 Consistent with the express legislative purpose of Montana's Youth Court Act, and of particular application here, the United States Supreme Court has recognized that:

*Three general differences* between juveniles under 18 and adults *demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders*. First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992). In recognition of the comparative immaturity and irresponsibility of

48

juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent.

The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . . "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.". . . This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) (hereinafter Steinberg & Scott) ("[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968).

*These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed*. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." . . . see also Steinberg & Scott 1014 ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood").

. . . [A] plurality of the Court recognized the import of these characteristics with respect to juveniles under 16. . . . We conclude *the same reasoning applies to all juvenile offenders*[.]

*Roper*, 543 U.S. at 569-71, 125 S. Ct. at 1195-96 (holding death penalty unconstitutionally cruel and unusual punishment for juvenile offenders) (internal citations omitted and emphasis added).

¶81    In fairness to the District Court, these cases are extremely difficult and devastating to all parties involved—victims and their families, youth offenders and their families, and the communities in which we live.  This type of illegal conduct and resulting harm is inexcusable and intolerable.  Despite increased public awareness and stepped-up law enforcement, the problem of sex offenses continues to plague our communities and society, often sparking high public interest and concern.  However, despite the pernicious nature of this problem and the understandably high public interest and concern, it remains never more imperative in our country and State that we remain vigilant that these types of cases are fairly prosecuted by the calm and objective application of the rule of law to complete and reliable facts, particularly in the case of juvenile offenders.  In no other way can our constitutional system provide fair, equal, and objective justice for all.

¶82    Our Youth Court Act, enacted by the people through the Legislature, has laid out a fair and objective framework to deal with these types of cases. The sole question at issue in this case is whether the District Court correctly determined, *on the evidence presented in court*, that *the governing provisions of the Youth Court Act* warranted youth court prosecutions or adult prosecutions in district court.

50

¶83 Glossing over the manifest deficiencies in the District Court's findings and application of the law, the Majority chides that "[i]t is not [this Court's] function to undertake . . . a *de novo* review of the record or to raise objections that might have been, but were not, made by the parties." True enough. However, it is nonetheless the function, *and duty*, of this Court to carefully review district court transfer hearing determinations for legal correctness, abuse of discretion based on arbitrary rationale, and clearly erroneous fact findings based on insufficient evidence, misapprehension of the evidence, or firm conviction of mistake. *Dietsch*, ¶ 10; *Derbyshire*, ¶ 19; *Whiteman*, ¶ 10. Aside from repeated cursory assertions of broad discretion, the Majority analysis simply falls short of our applicable standards of review.

¶84 For the foregoing reasons, I conclude that, in refusing to transfer these cases back for youth court prosecution and disposition pursuant to § 41-5-206(3), MCA, the District Court abused its discretion in contravention of the record evidence, express purposes of the Act, and R.T.'s fundamental constitutional rights to the presumption of innocence and to remain silent. I would: (1) reverse the District Court's transfer hearing orders, thus defaulting these cases to district court jurisdiction due to the expiration of the primary jurisdiction of the youth court at R.T.'s current age of 21, *see Beach*, 217 Mont. at 142-44, 705 P.2d at 100-02 (default district court jurisdiction over felony offenses under Mont. Const. art. VII, § 4(1) and §§ 3-5-302(1)(a) and 46-2-201, MCA), *abrogated on other grounds*, *Cope*, 250 Mont. at 395-96, 819 P.2d at 1285; (2) vacate R.T.'s district court sentence; and (3) remand to the District Court to order a comprehensive Department of Corrections status report pursuant to § 41-5-2503(1)(c), MCA, and for immediate

resentencing on R.T.'s prior guilty plea through a criminally convicted youth sentence review hearing and findings pursuant to §§ 41-5-2503(2), -2510(4), and -2410(5), MCA.

¶85     I dissent.

/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon and Justice Michael E Wheat join the dissenting Opinion of Justice Sandefur.

/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT